Next case is an international trade case coming to us from the International Court of Trade and the number is 2010-1128 SKF USA v. United States Mr. Shelley, whenever you're ready. May it please the court, my name is Herbert Shelley. I represent the SKF companies, the appellants in this case. The primary issue in this case is whether the Department of Commerce in an anti-dumping administrative review can lawfully require a respondent such as SKF Germany to acquire cost information on finished products that it purchased from an unaffiliated competitor in Germany. No, not quite. Pardon me? Not quite. I mean, they're not requiring you to obtain the information. They're saying the information has to be used and supplied to Commerce, right? So the initial request was for us to do so. But the real question is the reasonableness or the propriety of Commerce's relying on the cost of production information as opposed to the cost of acquisition, right? There are two aspects to it. For 16 reviews prior to this one, the Commerce Department has relied on the acquisition costs from SKF for what it paid for such products that it brought from the competitor. The two aspects of it here, whether in this situation, this particular review, Commerce had the authority under the anti-dumping law to require that that kind of data be used in an SKF calculation of dumping margins. And the second aspect to it is whether Commerce reasonably changed the policy after 16 years of reviews of doing the same use of unaffiliated cost information. We would argue that the standard of giving a reasonable reason for changing the methodology was not met in this case. It's a state forum issue, right? Yes. And, in fact, the only evidence on the record, which there is none, is a hypothetical question that Commerce posed as its reason was that if, in fact, the unaffiliated cost data do not give sufficient data to completely cover the costs, then we should not be able to use those costs. It's not really a standard. There's no evidence that SKF was not using the actual adequate cost data in the acquisition cost. And, in fact, the particular transaction that's in effect here, when the unaffiliated supplier sells these products to SKF in Germany, that supplier does not know that those goods are going to the United States. It's an internal sale within Germany totally unrelated to anti-dumping purposes for the United States. So it's not really a proper requirement for that sale unrelated to dumping to be applied to the SKF export price calculations in the dumping situation. But the particular products can be co-mingled. If SKF buys from an unaffiliated producer, let's assume it's from Poland, for instance, and it pays a certain amount, and those ball bearings are introduced into Germany, they could be co-mingled with products which come to the United States. Is that correct? If they were Polish products, Your Honor, they would not be subject to the anti-dumping order. Hypothetically. Hypothetically, they could be co-mingled. In fact, the shipments are often co-mingled with bearings from very different companies, but they are tracked. And when customs enters the goods into the United States, it has the means, we have the means, and customs has the means to distinguish which products in that container are subject to the anti-dumping order, would be manufactured in Germany, and to exclude products from Poland which are not subject to an anti-dumping order. So that becomes a customs issue. But for the anti-dumping purposes of calculating SKF's anti-dumping margins, those products, Polish products, would not be included. The German products produced by the unaffiliated supplier become subject merchandise for SKF if it exports those products to the U.S. It may not sell those products to the U.S. that it buys from the supplier.  But if those products are exported to the United States, a normal value must be determined for those products to compare to the U.S. price for the sale of the same product. But the Commerce Department can take the normal value as the price that was paid from the unaffiliated producer, or it can go behind that price and try to figure out exactly what that normal value is by asking for information from the unaffiliated producer. That's what happened here. That's what you're complaining about. What is wrong? Does Commerce have the authority to do that? Well, one, I would argue that Commerce doesn't have the authority under the law. Why not? Because the anti-dumping law is created to remedy price discrimination that injures the U.S. industry. One of the remedies for that that the law seeks to impose is to have foreign companies that are dumping remedy their pricing so they're no longer dumping in the U.S. If they can't do that or if they can't completely do it, an additional duty is imposed to make up the difference. That calculation and that right to try to eliminate your dumping margins is dependent on presenting your own cost and pricing information. The law prefers that the information on the books of the company be used to the extent possible for making that decision. And that's consistent with the overall purpose of the law, which is to give parties the right to control their export pricing to the U.S. subject to dumping to try to eliminate dumping. When you're superimposing data not in the control of SKF, which the company cannot see, the attorneys could not see until after it had been submitted, you're using data from a totally unrelated supplier to calculate the information, the calculations for a company that's subject to the dumping order. Wouldn't it be the individual unaffiliated company that's selling SKF in Germany, couldn't they be dumping at that particular point because they're not selling it at a fair value? Not at that point. The way that would be accounted for, and this company was subject to the same review, that company would have its own reporting requirements to the United States if they were chosen to participate and then they were a party to this proceeding. Their sale of a bearing to SKF in Germany, when that company does not know that it's going to be exported by SKF to the United States, is considered a home market sale for the company. The Commerce Department, in calculating that company's dumping margin, will treat that sale as part of the home market sales for that company in calculating the dumping margins for that company. It would not be used for the SKF dumping margin calculation. If this unrelated supplier knew that the sale to SKF was destined for the United States, again, that company, in its review, would have that sale counted as a U.S. sale and be part of the U.S. process for calculating their margins on the U.S. side of the equation as opposed to the home market side of the equation. And that would still have to be done at fair value? It would still have to be done at fair value, yes. But I'm a little puzzled as to how you can say that there's no authority. It may be that Commerce hasn't properly explained its change of position, that's another separate issue. But given the statutory language which talks about the records of the exporter or producer of the merchandise, it seems to me you've got a hard row to hoe in arguing that the statutory language isn't susceptible to an interpretation that Commerce has this authority. Well, Article 1677.28 is the definition of exporter or producer. And it has a specific definition for 1677D cases, which is this, constructive value cost calculations. And the definition in 1677.28 is that exporter or producer, the term means the exporter, the producer, or a combination of both, the two together, to the extent necessary for Commerce to calculate an upping margin. Now, this provision, in each of the cases that Commerce cited in its... How can it be that this provision isn't at least ambiguous as to whether they can go to rely on the producer cost? And, you know, under Chevron they have the ability to interpret that, and they've interpreted it as giving them the authority to go behind the exporter and look at the producer cost. I mean, that seems to be very hard for you to argue that as a matter of Chevron deference they can interpret the statute that way. That's not the end of the matter, but it seems to me that in terms of the basic authority, that's a hard problem. Well, I believe when you look at the actual... First of all, the preference of the statute to use a producer or an exporter's own data, that's the first thing they should look at and to see whether that is viable. In this case, it's the... The statute doesn't say that. In 1777bf1, it says that the preference for the statute is to use actual costs of the party participating, and in this case the unaffiliated supplier is not. But the provision in 28 where they need to... where the exporter and producer are combined in the definition of the statute is really the situation where there are unrelated resellers that do not produce merchandise, but there's a close relationship with the producer and commerce in elemental sulfur and several of the other cases, the only cases cited by the government, has found that in these situations they have to go to the producer because there's no control and there's not enough information to get to the other side of the equation. But in situations where you have competing producers and exporters, as in the SKF supplier situation, there's no reason to go behind the SKF data, particularly if there's been no reason articulated to challenge the data that's on the record by SKF. The question, though, is not whether there's any reason to go behind the information. The question is whether commerce has the authority to go behind it if commerce decides that that's a more accurate way to discern the cost of production. Commerce needs to have some evidence to support that determination. Commerce can't... We're not talking about the evidence, we're talking about the authority, the statutory basis for the commerce to look behind the cost of acquisition. When you request an anti-dumping review as an exporter, you're requesting a review only for yourself. You're not including any other parties. Your right to have your calculation of your margins or your liability is based on your investigation. And the fact that there is another supplier in the country that makes the same bearings and may in fact sell some bearings to you does not give the Commerce Department the right to not base its decision on the basis of the company's own information. The review that my company requests is to calculate a margin based on my company's activities. And Commerce, I believe, or we assert, does not have the authority to use my competitor's information that we have no control over, that we cannot factor it into our pricing because the company has no idea what the pricing and the costs are that are provided to the Commerce Department. It's a fundamentally unfair process that they're applying to companies that have adequate information on the record for Commerce to calculate their margins. That still doesn't answer the question as to whether or not we have the authority to do that. Well, in certain situations, in 1677 B.E. 2, it's clear that the SG&A information, which is tied to the Commerce in the first paragraph, the cost information, is applied only to the exporter subject to the review. There is some question whether the cost information in the first paragraph should also be limited because of the way the statute is interpreted. If our interpretation is correct, then it's got to be the specific information for the company being investigated, not information from another company. The statute is ambiguous, as Judge Dyke points out. Chevron definitely should apply it. Well, our argument would be that it's not ambiguous. Thank you, Mr. Chairman. We will restore it two minutes later. May it please the Court. SKF's interpretation. Let's assume that we agree with you that Commerce has the authority to look at the producer costs, okay, under the statute. The question then becomes, is Commerce, one, explain why it's changed its policy in this respect, and two, is it given a reasonable explanation for doing what it did in the light of all the problems that Mr. Shelley has pointed out with using producer costs? And I look at the Commerce decision, and I find pretty little in there explaining why it's doing this. Well, I'll start first with page 5003 of the record, which is the cost memo that is included in this annual review. In that memorandum, Commerce explains the reasons why it is changing its methodology in these reviews for some companies, including SKF. The language on pages 5002 and 5003 is similar to the language. Where is the language? Starting in the second paragraph on page 5002, Commerce first starts talking about the relative insignificance, I'm in the middle of the paragraph, of sales of merchandise purchased from unaffiliated suppliers for some companies. Then later on, on the next page, 5003, in the middle paragraph, with respect to SKF Germany, Commerce determines that a substantial proportion of its U.S. sales and some of its home market sales were sales of merchandise produced by unaffiliated suppliers. And in that instance, Commerce determined that it may become necessary to use CV as the basis for normal value, and we should require the respondents to provide the CV. That's Commerce's first step in its determination in this review. Of course, now Commerce, in the previous review, indicated to the parties that it might take this step. This memorandum constitutes the first step in this review where Commerce I must say, I don't understand why the fact that only a small part of the merchandise was produced by unaffiliated suppliers has anything to do with explaining the change in position. Was that not true before? It's not a change, is it? If Your Honor is referring to the language on page 5002, I think what Commerce is saying is that for those companies who have had an insignificant number of sales from other suppliers, it might not be appropriate to disregard the cost of acquisition. But for those companies like SKF that had a substantial proportion of sales, it might be appropriate. Why is the fact that it's a substantial proportion of sales, why is that an answer to all the problems that Mr. Shelley has identified? Well, I think Mr. Shelley actually identified precisely why it is important. I think Mr. Shelley made the comment that in situations where a company like SKF, let's say, gets all of its bearings from another supplier, there's absolutely no transparency into what the cost of production is. The reason why Commerce changed its methodology here is because in situations where a significant proportion of sales is coming from a supplier, that same lack of transparency problem exists. You mean there's not enough cost data for the exporter? There's not enough, that's correct. We don't know, we have absolutely no transparency into what the actual cost data is. And I think it's very important that Commerce makes a distinction between those companies who are getting an insignificant proportion of their bearings from other suppliers versus a substantial proportion from other suppliers. Was this a change from the situation that existed earlier, that before it was a relatively insignificant proportion and now it's a substantial proportion? Well, we only know the answer to that going back to the 15th review. Obviously Commerce has been doing it one way for the first 15 reviews. In the 15th review, one of the domestic producers alerted Commerce to this potential problem that some companies were getting a substantial proportion of their sales from other suppliers. So Commerce looked into it and determined that they were too far into the 15th review to make any change. But then in the future they would start asking what the significant percentage was for the different exporters. Then Commerce began asking the question, and of course in this review they asked the question, and some exporters said, we don't get very many at all, and some exporters like SKF said, well I don't think they said that we get a significant proportion, but Commerce determined that the proportion was significant. And it was significant. It's confidential data, but I can say that it's somewhere in between a quarter and a half of its home market sales. Was this the first notice that was provided to the importers that the cost data from the unrelated supplier would be used? No. This is the 17th administrative review. The parties first got notice that this change was coming during the 15th administrative review. Wasn't it the same notice as this? It would be substantial versus insignificant determination? Well, sort of. What Commerce said was, this issue has been brought to our attention by Timken, we're thinking of changing it, we can't change it right now. One of the reasons why we're not going to change it is because it looks like it's not going to make a significant difference anyway, because the percentage of sales acquired by other suppliers probably isn't that big. But be on notice that this is something that we're going to do in the future. And then of course Commerce didn't. Did this apply to all importers of ball bearings or just to SKF? The request from Commerce to anyone who requests a review applies to anyone who requests a review. The request is, please tell us what proportion of your sales you get from other suppliers. So only the people who had a substantial proportion of their sales from unaffiliated suppliers would be subject to this new rule of going back to the producer of costs? Right, that's certainly how Commerce applied it in this review and applied it in the next review. So for somebody who's just a small portion, they continue to use the transaction costs? That's correct. But don't you think that Commerce could have and should have explained why this change in policy doesn't implicate all the problems that Mr. Shelley identified or had some explanation as to why those problems are either not significant or outweighed by this other thing? The explanation here seems to be pretty summary. Well, on page 12,047 of the joint appendix, which is part of the final results, toward the bottom of the page, the big second paragraph, Commerce addresses SKF's arguments regarding the inability to acquire this information, and I think that's what Your Honor is getting at. Well, that's one of the things. Right. And Commerce raises the same arguments that we put forth in our brief. This information is available to SKF's counsel. This information was obtainable. I mean, it was obtained in this review. So the potential difficulties that SKF has articulated did not come to bear in this particular review, and frankly, they didn't even really come to bear in the next administrative review that SKF references in its brief. Now, there was an additional inquiry regarding an application of adverse facts available, but the reality is that Commerce and or SKF together were able to obtain the information in both of the reviews. So it really doesn't seem to be that much of a problem. Does Commerce ever publish in the Federal Register a notice saying that from now on, we're going to start using the cost of unaffiliated producers if their contribution is substantial? Do they ever do that to put people on notice generally so that when they come into Commerce with a request for review, they know exactly what rules and regulations they have to comply with? Sometimes Commerce does do that. For example, I think SKF cited the Parkdale case in its brief. That involved a wholesale change in methodology with respect to Commerce's reseller analysis, and in that instance Commerce issued a Federal Register notice of a change in practice. But Commerce doesn't do that for smaller changes in methodology of this nature. Well, it was slipped in in the bottom of the public notice on the bottom of the page saying we're going to start looking at substantial contributions made by unaffiliated producers. We didn't look at their cost factors. Well, we respectfully disagree with the characterization of it being slipped in. I understand you would object to it. On page 2,000 of the joint appendix, the Court can look at Commerce's initial class memorandum from 2005. This is from the 15th review. This was provided to all the parties on the record in that review, and it signaled a change in methodology that actually didn't occur until two years later. That's significant notice, and of course Commerce doesn't have to provide this kind of notice. Commerce can change its methodology just in the context of the administrative review. No, just within the context of this administrative review. Your Honor, I see that I'm out of time. I don't want to take away time from the intervener, but I would like to make one comment about zeroing. Keep it short. I will keep it short. Zero time. We submitted a notice of supplemental authority late last week, and we apologize for doing it late. The reason why we did it is we wanted to raise it just briefly today. The Court has heard many, many zeroing cases over the years. It's been our position over the past few years that there's absolutely nothing new for the Court to decide. With the Court's issuance of U.S. Steel in early October, in our opinion, that's the final nail in the coffin of zeroing, and we just wanted to make the Court aware that there's absolutely nothing more to talk about on that issue. Thank you. Thank you. Good morning, Your Honors. Good morning. In light of your interest in the issue of whether there was a sufficient explanation by Commerce for the supposed change in practice, I would like to state my opposition to the terminology, really, because in the 15th review, I was the one that went to Commerce and convinced them to go get these data where it was appropriate to do so. And I did that in a meeting where I explained what Commerce's practice was. And there are a number of cases where Commerce has done this. A lot of these cases, of course, are cases where it's pretty obvious you have to do it. Like, for example, in the cases that involved the exportation or the importation of honey, obviously the beekeepers weren't the exporters. There were other people that were doing the exporting and the selling because of the different skills required. Now, so it's not as if this is a, quote, unquote, new practice. So the only cost in that situation were the producer costs. Right. Well, no, there was also the selling. I'm sorry to interrupt you. There was also the selling and general expenses. Yeah, I understand. But as to the actual production cost, you had to go to the producer because the exporter wasn't producing the goods. Right. Now, here we have a situation in which a quarter to or more than half of the merchandise is being produced by the exporter. And why are those costs not sufficient is the question. And Commerce really hasn't explained why, having that breadth of cost data available from the exporter, they had to go to the producer cost data. I see the question. First of all, it's not the case that there was not precedent for that, too. I mean, there have been a number of several cases, and pasta comes to mind, and raspberries is another one, and cattle is another one, where Commerce did, in fact, have a situation like this, where you had an exporter who did some of the producing and some of the other stuff that he sold was purchased. So that, too, is really not new. What is new, of course, is Commerce's application in this case, because it goes to- What was the explanation that Commerce gave in those other cases for doing this, for going to the producer's data? The explanation was simply that they needed the data because of the instruction of the statute, because the statute- Well, that's not very satisfactory. The statute doesn't tell them that they have to use the producer data. Well, this- when instead of the exporter data. That's true, Your Honor, but there's no getting around the fact that the statute says that the first element of cost of production and the first element of constructive value is the cost of fabrication and processing, and the only place to get that, really, is with the company or the entity that actually is doing the producing. Now, it can be that in a number of circumstances the acquisition cost can be presumed to incorporate all these costs, but I think in the normal course of events I would say maybe not so, and particularly in the context of these cases where Commerce has made numerous findings with regard to all of the major producers that they sell below cost in the home market. So the idea that automatically, per se, the acquisition costs are a total reflection of all the costs is nonsense. What about this loophole argument that is quoted on page 19 of the amicus brief? Is that what this is all about? Are you familiar with that? Well, yes. I mean, I agree with Commerce's explanation that not getting the actual costs where this would make a difference is opening a loophole because you would just simply ignore one of the measures that the statute sets out for the calculation of the dumping margin. That leads me to one other point. I will agree with SKF that a difficulty with this is that the SKF, the party that's being investigated, his ability to predict what the margin will be or to conform pricing in the United States so there is no margin is diminished by this because the SKF obviously does not know what the costs are of its suppliers. That's a good point. So why doesn't Commerce explain why that's not a problem? There's all sorts of problems here that Commerce hasn't addressed, and that's one of them, right? The problem with that difficulty, as it is stated by SKF, is that there's nowhere in the statute that makes science or knowledge a requirement of dumping. I mean, dumping is the result. Commerce imposes a duty that is the result of a calculation, U.S. price compared with normal value. The difference is the dumping duty. It doesn't matter whether or not they know. Yeah, but it's a reasonable argument against using the producer costs, and it would be nice if Commerce said, well, we understand that that argument has been made. Either it's not significant or it's outweighed by these other things. Normally an administrative agency is supposed to explain what its response is to the problems that have been identified with the approach that it's proposed. That's what it's supposed to do. And the question is whether Commerce has done an adequate job of that here. Well, I believe it has. You would, I think, fairly need to consider also the explanation that was submitted in the 15th review, which is part of the Joint Appendix JA2000, and then the additional explanations in the current review. And what you will see there is that Commerce was concerned that if there in fact were a significant portion of the sales that were not made by SKF and instead were purchased, that if it didn't go get this particular element of normal value, it wasn't making a complete calculation of normal value. And it recognizes the difficulties, particularly in the earlier memo it recognized those difficulties, but it also explains that it is an element of the normal value explained in the statute, both in the constructive value part and in the cost of production part. What about the notice requirement? And I'm still troubled by the notice. The fact that the only notice that's really available is a shift in policy from the 15th to the 16th to the 17th review, without any real public notice provided. If you're going to develop a process by which you are changing the underlying rules, don't you believe that the Commerce Department has an obligation and a duty to publish that notice? Well, I suppose I have two answers to that. One would be that I don't think it's a new practice of the kind that you would put in a notice, since it's basically an application of a practice that was ignored in these reviews, but is now no longer ignored. There's a number of cases where they got these costs. So that's one aspect of the answer. And the other aspect of the answer would be, look, Commerce could have introduced or applied this practice immediately, in my view. And instead, in recognition of the difficulties, it gave the respondents two years of two reviews notice. And that's not a usual thing for Commerce to do. They have done this in these reviews twice. They did it for the model match change, and they also did it for this. Thank you. Thank you, Your Honor. Just a couple of the points I'd like to address. First, with regard to the facts concerning SKF's purchases, they haven't changed throughout the review period. SKF Germany is one of the smaller producing companies involved in these investigations now. It has a smaller product line, but still has customer needs around the world for certain variants that it produces in Germany, and so it acquires these products from there. But the facts in 17 are no different than the facts in 16, 15, and 14 for the last several years. The contention is that Commerce didn't know the substantial nature of the purchases from unaffiliated suppliers until, I don't know, the 16th review or whatever it was. Whenever Mr. Deprest came in and talked to him is when they allegedly found out that there might be an issue, but there is no issue. And I think that goes to the question of the unaffiliated cost calculation, the unaffiliated cost itself. There is a good presumption that an unaffiliated cost in this situation is a fair cost to be used on the foreign market side of this equation. These two companies are major competitors in the world. The company that supplies these bearings to SKF also sells these bearings in the United States and everywhere else, so there is absolutely no incentive for it to give SKF a beneficial price that would lower SKF's costs on the foreign market side. This is not the agriculture cases where you have a reseller and a producer, but the seller does not have access to any cost information. That's the only legitimate place that Commerce has applied this policy in other reviews. The other thing is it does put SKF, companies like SKF, in some jeopardy. In the 18th review, as mentioned by the government's counsel, the SKF in that review, again, could not get the cost data from the supplier. The Commerce Department asked for the information from the supplier. The supplier's attorney gave the data to Commerce three days after the deadline in which Commerce had asked it to be filed. Commerce rejected the data and sent it back to the supplier and applied adverse facts available to SKF for not having obtained the data that was requested from the Commerce Department. Now, the judge in the underlying case, which may be next year, in this case, kept his ruling the same as he has in this case regarding Commerce's ability to ask for the data, but he reversed the Commerce Department and said there was no basis to apply adverse facts available to SKF because its supplier failed to supply data in time. It's a different issue, but it points out the vulnerability of a company in this situation because it has no control over its facts when Commerce is imposing these obligations that it has no control over for calculating its own dumping margins. There's the point of whether SKF's counsel has access to this information under a protective order, and we did after it was submitted to the Commerce Department, but that's a different situation than a company who's calculating how it sells its products in the United States pursuant to a dumping order and having control over the data to know what the situation is. The counsel does not have information, and we did not have information to that data when it was submitted to the Commerce Department. We couldn't have commented on it. We had no control or knowledge of the applicability of that in relation to SKF's submission of its own information for its margins. So it's not the same thing. An APO does not solve this situation. An APO allows us to look at submissions by other parties and criticize things that we think are inappropriate. It does not have anything to do with our clients submitting data that we have no control over. So unless you have any other questions, I'm through, Your Honor. Thank you, Mr. Short.